# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

EUGENE CHERRY and
VALERIE ANN DABEL,

        Plaintiffs,

     v.                                        Case No. 11-C-1021

WASHINGTON COUNTY SHERIFFS'
DEPARTMENT, DALE K. SCHMIDT,
JAMES WOLF, THOMAS ABBOTT,
RONALD REWERTS, WISCONSIN STATE
TROOPER MIKE JANKOWSKI,
BRUCE THEUSCH, MICHAEL "R.J." ANDERSON,
BUCK JEREMY ROBERTSON,
RANDY BOUDRY and MIKE CUMMINGS,

        Defendants.

---

## DECISION AND ORDER

---

      Plaintiffs Eugene L. Cherry and Valerie Dabel, proceeding pro se, brought this 42 U.S.C.
§ 1983 civil rights action against the above-named law enforcement defendants, alleging violations
of constitutional rights relating to their arrests for an attempted burglary. Cherry and Dabel claim
they were subjected to false arrest, illegal searches, unlawful detentions and excessive force in
violation of the Fourth Amendment. In addition, Cherry claims the defendants engaged in racial
profiling in violation of the Equal Protection Clause of the Fourteenth Amendment. The Court has
jurisdiction under 28 U.S.C. § 1331. Both sides have now moved for summary judgment. For the
reasons that follow, summary judgment on all claims should be granted to the Defendants.

## I. Background

At approximately 11:00 a.m. on November 29, 2010, a concerned citizen called the Washington County Sheriff to report a suspicious vehicle at her neighbor's house on County Highway W in the Town of Addison. The caller reported that she had observed a vehicle back into the driveway and two black males, who did not live there, exit the vehicle and proceed to the rear of the residence. Deputy Ronald Rewerts was dispatched to the residence. Upon his arrival, Deputy Rewerts observed Valerie Dabel in the driver's seat of a car parked in the driveway. The car was backed up to within twenty feet of the garage with its trunk open. Deputy Rewerts approached the vehicle and asked Dabel why she was there. Dabel told Rewerts she stopped to ask for directions and the people who were with her were now at the back of the house. Thinking that Dabel's explanation made no sense in light of the fact that they were located in a residential area well off the highway and that it failed to explain why her two passengers had gone around to the back of the house, or why her car was backed up to the garage with its trunk open, Deputy Rewerts concluded that Dabel and the men accompanying her were probably in the process of committing a burglary. He took possession of Dabel's keys and called for back-up.

Wisconsin State Patrol Trooper Michael Jankowski was in the area and responded to Rewerts' request for back-up. Jankowski removed Dabel from her vehicle, handcuffed her, performed a pat-down search for weapons and contraband, and placed her into the back of a squad car. Additional officers arrived shortly thereafter, and determined that a forced entry had been made to the rear access door of the attached garage. Fearing that Dabel's companions were still in the house, the officers called for the County Swat team to make entry. Upon entering the home, the officers found Dabel's companions had fled. Several items of value, including a large screen

television and other electronic equipment had been unplugged and disconnected, and piled in a room at the front of the house from where they were presumably to be loaded in Dabel's car. Additional items, including a pair of glasses, American and foreign coins, and paper money, were found along clearly detectable footprints that led from the back yard down a footpath to a large grassy area.

In the meantime, a second call came in to the Sheriff's dispatch center reporting two males, one black and one Hispanic, walking in the ditch area of Wildlife Road about a mile away. The caller reported that both appeared wet and muddy from their knees down to their feet. Lieutenant Bruce Theusch and Detective James Wolf of the Washington County Sheriff's Department, together with Sergeant Cummings of the Hartford Police Department, proceeded to that location where they observed Cherry and Steven Turner, both black males and both muddy from the knees down. Given the facts that they matched the race of the two individuals seen going to the rear of the house that was burglarized, their proximity to the residence broken into, they had no car or other means of transportation in the area, and their feet were muddy, Lieutenant Theusch and Sergeant Cummings concluded it was probable that Cherry and Turner were the two individuals who were with Dabel, that they had broken into the home, and that they had fled through the backyard and down the trail leading to the ditch after police arrived at the scene. Both Cherry and Turner were ordered to the asphalt at gunpoint. The officers' conclusions that Cherry and Turner were involved in the burglary were confirmed when during a subsequent search at the Sheriff's Department, several foreign coins taken from the house were taken from Cherry and Turner.

Dabel, Cherry and Turner were charged with burglary and proceeded to trial in state court. Dabel was acquitted but Cherry and Turner were convicted and are now serving prison terms. Cherry and Dabel thereafter commenced this action against several of the officers involved in their

3

arrests.  The defendant law enforcement officers now move for summary judgment on the ground

that the undisputed material facts establish that they are entitled to judgment as a matter of law.


**II.  Summary Judgment Standard**

A motion for summary judgment should be granted when there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Material" means that the factual dispute must

be outcome-determinative under law.  *Contreras v. City of Chicago*, 119 F. 3d 1286, 1291 (7th Cir.

1997).  A "genuine" issue must have specific and sufficient evidence that, were a jury to believe it,

would support a verdict in the non-moving party's favor.  Fed. R. Civ. P. 56(e); *Anderson v. Liberty

Lobby, Inc.,* 477 U.S. 242, 249 (1986).  The moving party has the burden of showing there are no

facts to support the non-moving party's claim.  *Celotex* 477 U.S. 317, 322 (1986).  In determining

whether to order a motion for summary judgment, the court should consider the evidence presented

in the light most favorable to the non-moving party.  *Anderson*, 477 U.S. at 255.  When the record,

taken as a whole, could not lead a rational jury to find for the nonmoving party, there is no genuine

issue and therefore no reason to go to trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475

U.S. 574, 587 (1986).


**III.  Analysis**

**A.  Unlawful Arrest And Search**

Plaintiffs claim that they were unlawfully arrested.  Whether a warrantless arrest is

constitutional depends on whether there was probable cause for the arrest.  *Woods v. City of*

*Chicago,* 234 F.3d 979, 987 (7th Cir. 2000). "The determination of whether an arresting officer has probable cause to arrest an alleged offender turns on whether a reasonable person in the officer's position would have probable cause to believe that an offense has been committed." *Id.* at 997. Certainty, or proof beyond a reasonable doubt is not needed for an arrest. The standard of probable cause is intended both to safeguard the rights of people to be free of unreasonable search and seizure while at the same time affording law enforcement the latitude needed to effectively protect the public:

> These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.

*Brinegar v. United States*, 338 U.S. 160, 176 (1949).

Moreover, "[u]nder the 'collective knowledge' doctrine, the officers who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of other officers." *United States v. Nicksion*, 628 F.3d 368, 376 (7th Cir. 2010) (citing *United States v. Parra*, 402 F.3d 752, 764 (7th Cir.2005)). "In other words, there is no Fourth Amendment violation if the knowledge of the officer directing the stop, search, or arrest—or the collective knowledge of the agency for which he works—is sufficient to constitute probable cause." *Id.* (internal quotation omitted). It is clear here that the officers were in constant

communication with one another throughout the time leading up to Cherry's arrest and thus the collective knowledge doctrine applies.

### 1. Dabel

By this standard, the arrest of Dabel was lawful. Dabel was seen backing into the driveway of a home in a residential neighborhood in the late morning hours of a weekday. (I take judicial notice pursuant to Fed. R. Evid. 201of the fact that November 29, 2010, was a Monday.) The neighbor who called the Sheriff's Department reported seeing two black male occupants of the vehicle who did not live at the address exit the vehicle and walk to the back of the house. When Deputy Rewerts arrived at the scene, he not only found Dabel in her car still in the driveway, but he also observed that her trunk was open. When asked why she was there, Dabel gave Deputy Rewerts the improbable explanation that she was seeking directions. Deputy Rewerts found the explanation improbable because she was in a residential neighborhood far off the highway, not the place one would normally stop to seek directions, and the people that accompanied her had gone to the back of the house, again not normal for one seeking directions. Moreover, requesting directions was a one-man job that would have taken at most a few minutes, and the two men that had left the car supposedly for that purpose had still not returned by the time Deputy Rewerts arrived.

These facts were sufficient to justify detaining Dabel while Deputy Rewert conducted further investigation. *See Terry v. Ohio*, 392 U.S. 1 (1968) (holding that, under Fourth Amendment, law enforcement officer may briefly detain person on less than probable cause where he reasonably suspects person has committed, is committing or is about to commit a crime). The fact that Dabel was then handcuffed and placed in Trooper Jankowski's squad car did not transform Deputy

6

Rewert's actions into an arrest. *See United States v. Bullock*, 632 F.3d 1004, 1016 (7th Cir. 2011) ("We have previously found that using handcuffs, placing suspects in police cars, drawing weapons, and other measures of force more traditionally associated with arrests may be proper during an investigatory detention, depending on the circumstances."); *see also United States v. Shoals*, 478 F.3d 850, 853 (7th Cir.2007) (stating that police officers do not convert *Terry* stop into full custodial arrest by drawing their weapons or handcuffing the subject, particularly where the situation is inherently dangerous); and *United States v. Chaidez*, 919 F.2d 1193, 1198–99 (7th Cir. 1991) (detention did not turn into arrest even though agents drew guns, took car keys, gave Miranda warnings, took one defendant to police van to sign consent-to-search form, and detained defendants for ten to fifteen minutes during search of house; the intrusion was less than that involved in an arrest). Shortly thereafter the responding officers reported evidence of a forced entry to the home. At that point, police had ample reason to believe that Dabel was involved in a burglary, and she was removed from the scene. Her evasive responses to questioning after that point only added to the evidence supporting her arrest. Based on these facts, I conclude Dabel's detention and arrest were lawful. Her claim for unlawful arrest and detention is therefore dismissed.

To the extent Dabel claims she was unlawfully searched, this claim fails as well. *Terry* also holds that a law enforcement officer confronted with reason to believe a suspect may be armed may lawfully conduct a pat-down search for weapons. See also *United States v. Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001). The facts the officers confronted suggested a burglary in progress. Burglary is inherently dangerous because it can and often does culminate in violent confrontation. *Taylor v. United States*, 495 U.S. 575, 588 (1990). Reasonable suspicion that an individual is involved in a burglary in progress is a sufficient reason for believing the individual could be dangerous.

7

Jankowski's pat-down was justified. Summary judgment on this claim should be granted to the defendants as well.

## 2. Cherry

The question of whether law enforcement had probable cause to arrest Cherry is a closer question. At the outset, it should be noted that the defendants do not argue that Cherry's claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), so I leave that issue aside. Assuming the claim is not barred, Cherry's claim is that he was arrested as a suspect in a burglary because he and his friend were of the same race as the two individuals seen going to the back of the house that was burglarized and happened to be walking down the street with his friend an hour after the burglary was discovered and approximately a mile away with muddy clothing. Muddy clothing might indicate that they had fled from somewhere and were more concerned with getting away than with whether they got their clothes wet and muddy. But is this enough, together with the general description of the suspects consisting of only their race and gender, and the relative proximity to the scene of the crime, to constitute probable cause?

Cherry accuses law enforcement of racial profiling and suggests the officers did something wrong in using his race to identify him as one of the individuals who was seen leaving Dabel's car and going to the back of the residence that was later found to have been burglarized. But there is nothing wrong with using a suspect's race as a factor in describing him to police, or in police relying on the person's race in determining whether he fits the description of the suspect. *See* Harris, David A., **USING RACE OR ETHNICITY AS A FACTOR IN ASSESSING THE REASONABLENESS OF FOURTH AMENDMENT ACTIVITY: DESCRIPTION, YES; PREDICTION, NO**, 73 Miss. L. J. 423, 427-28 (2003) ("Race or ethnic appearance can and should be used to describe a known suspect or suspects--that

is, to tell law enforcement officers and the public what particular suspects look like. But race or ethnic appearance should not be used in efforts to predict who might be involved in unknown criminal behavior."). The question here is not whether law enforcement were wrong in considering the fact that Cherry was black in concluding that he was probably one of the burglars they were looking for; the question is whether in the context of this case, Cherry's race and the other information known by the officers were sufficient to support a finding of probable cause that Cherry actually was one of the burglars.

By itself, Cherry's race would clearly be insufficient to justify his arrest. The fact that the two individuals who were seen leaving Dabel's car and proceeding to the rear of the burglarized residence were black certainly limited the number of people who could have fit the description, especially in Washington County. In this regard, the Court can take judicial notice of the fact that the most recent census figures show that Washington County has a population of 132,386, of which only 1% are Black. http://quickfacts.census.gov/qfd/states/55/55131.html (last visited on June 28, 2012). But that would not tell us anything about the number of African-Americans living in the area where Cherry and Turner were apprehended. It may be that the officers knew from their experience that there were no people of African descent living in this particular part of Washington County, but the record is silent as to this fact as well. Nor is there any indication that either Cherry or Turner did anything when they were approached by the officers that indicated guilt.

It should have been a simple matter for the arresting officers to have developed a stronger evidentiary basis for the arrest of Cherry and Turner. They could have simply asked the two to identify themselves and explain what they were doing and where they had come from, preferably after separating them and outside of each other's hearing. It is difficult to imagine any response they

could have given that would not have added to the quantum of evidence supporting a finding of probable cause. A pat-down search, clearly justified under the circumstances, might have disclosed the foreign and domestic coins that filled their pockets and were similar to the ones found scattered in the back yard, providing further evidence supporting their arrest. And, of course, bringing them back to the scene to provide the neighbor who reported them an opportunity to identify them, something clearly permissible under federal law, *see United States v. Funches*, 84 F.3d 249, 254 (7th Cir.1996), though now uncertain in Wisconsin, *see State v. Dubose*, 2005 WI 126, 285 Wis.2d 143, 699 N.W.2d 582, might also have bolstered the arrest. At least they could have asked the witness what the two men she saw earlier were wearing. But that was not what the arresting officers did when they came upon Cherry and his friend. They simply drew their guns, ordered the suspects to the asphalt, handcuffed them, and then transported them to the Sheriff's Department where custodial searches produced the coins that the homeowners identified as having been taken earlier that day. But since that evidence came to light only after the arrest, it cannot be used to justify it.

What we are left with is evidence of a burglary committed by two males described as black who apparently fled from the residence shortly after police arrived. Footprints and a trail of property indicates that the two fled down a trail in back of the house. Approximately an hour later, two black males are seen about a mile away walking along a ditch with mud from their knees on down. They had no visible means of transportation, and the area through which they would have had to traverse in order to arrive at that location from the scene of the crime was wet and muddy. (Def.'s PFOF, ECF No. 78, ¶ 68.) Whether these facts are sufficient to establish probable cause is uncertain, but they are sufficient to support the officers' good faith belief that they had sufficient

evidence to lawfully arrest Cherry and Turner. And if that much is true, then the arresting officers are entitled to dismissal under the doctrine of qualified immunity.

The doctrine of qualified immunity is intended to shield public officials from liability for damages when they are going about in the performance of their duties so long as their conduct does not violate clearly established federal statutory or constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986). To prevail on a defense of qualified immunity under the circumstances of this case, the defendants must show that they were reasonable in their belief that they had probable cause to arrest Cherry. *Hunter v. Bryant*, 502 U.S. 224, 228-29 (1991). Here, I conclude that standard is met. Accordingly, Cherry's claim for false arrest will also be dismissed.

## B. Excessive Force

Cherry and Dabel also claim they were subjected to excessive force in the course of their arrests. Dabel's claim seems to be based on the fact that Deputy Rewerts pointed his gun at her and threatened to shoot her if moved when he initially detained her. (Pl's PFOF, ECF No. 52, ¶ 17.) Cherry complains that he was threatened with guns and that someone knocked him forward and pressed his face to the concrete when he tried to turn around. (*Id*. ¶ 25.) He claims he suffered excruciating pain to his face. (*Id*. ¶ 27.)

Claims that law enforcement officers used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a free citizen are analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). "Determining

11

whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotes omitted). An officers right to make an arrest or investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* In applying the test of whether the force or threat of force used was excessive, the court must consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

Applying these standards here, I conclude that Dabel's claim fails. Pointing a gun at someone may seem excessive, but Deputy Rewert reasonably believed Dabel and her friends were involved in a burglary, a serious crime punishable in Wisconsin by up to ten years in prison. Rewert did not know whether Dabel and her accomplices were armed. Importantly, Deputy Rewert did not actually use force but simply threatened Dabel with what would happen if she did not cooperate. Under the circumstances, his actions were reasonable and did not violate the Fourth Amendment.

Cherry's claim of excessive force fails as well. His claim that the officers' training their guns on him fails for the same reason Dabel's does. They had reason to believe Cherry had just committed a serious crime and did not know whether he and his accomplice were armed. As to his complaint that his face was shoved into the concrete, Cherry offers no evidence of more than temporary pain and discomfort resulting from such conduct. There is no suggestion that the pain lasted more than a few moments. "With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: 'Not every push or shove, even if it may later seem

unnecessary in the peace of a judge's chambers'. . . violates the Fourth Amendment."*Graham*, 490

U.S. 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Here, the brief use of

force resulting in temporary pain and discomfort is not sufficient to demonstrate a violation of the

Fourth Amendment. Perhaps more importantly, Cherry fails to identify the defendant who he claims

shoved his face into the concrete. Absent evidence identifying the person responsible, the claim

must fail.

## III. Conclusion

Based on the undisputed evidence before me, I conclude that Plaintiffs' illegal arrest and

excessive force claims fail as a matter of law. Several of the defendants named had no discernable

involvement in either Dabel's or Cherry's arrest, and thus they should be dismissed in any event.

Cherry has produced no evidence of racial profiling, and any remaining claims find no support in

the record. Finally, Cherry's motion for appointment of counsel is denied. The case was not

complex, his communication skills were sufficient to allow him to present his case, and there was

insufficient merit to his claims to warrant Court recruitment of counsel. Given that his co-plaintiff

was not in custody and could provide assistance, Cherry had greater advantages in prosecuting his

action than most inmates who represent themselves.

For all of the reasons stated above, the defendants' motions for summary judgment on all

claims are granted. The Clerk is directed to enter judgment in favor of the defendants and against

the plaintiffs.

**SO ORDERED** this 29th day of June, 2012.

s/ William C. Griesbach
WILLIAM C. GRIESBACH
United States District Judge

13